CHEMEHUEVI TRIBE OF INDIANS ET AL. *v.* FEDERAL POWER COMMISSION ET AL.

No. 73–1380. Argued January 13, 1975—Decided March 3, 1975*

---

*Together with No. 73–1666, *Arizona Public Service Co. et al.* v. *Chemehuevi Tribe of Indians et al.;* and No. 73–1667, *Federal Power Commission* v. *Chemehuevi Tribe of Indians et al.,* also on certiorari to the same court.

*Joseph J. Brecher* argued the cause and filed a brief for the Chemehuevi Tribe of Indians et al. in all cases. *Deputy Solicitor General Wallace* argued the cause for the Federal Power Commission in all cases. On the brief were *Solicitor General Bork, Mark L. Evans, Leo E. Forquer, Drexel D. Journey, George W. McHenry, Jr.,* and *Daniel Goldstein. Northcutt Ely* argued the cause for the Arizona Public Service Co. et al. in all cases. With him on the briefs were *Harry A. Poth, Jr., Peyton G. Bowman III, William Duncan, Burt S. Pines, Rex E. Lee, C. Hayden Ames, John R. Bury, L. V. Robertson, Jr., Donald E. Dickerman, Sidney G. Baucom,* and *Robert Gordon.†*

MR. JUSTICE STEWART delivered the opinion of the Court.

In these three cases we review a single judgment of the Court of Appeals for the District of Columbia Circuit, to

---

† Briefs of *amici curiae* in all cases were filed by *Francis M. Shea, Richard T. Conway,* and *David Booth Beers* for Montana Power Co. et al., and by *Robert C. McDiarmid* for the Electric and Water Plant Board of Frankfort, Ky., et al. *James H. Goetz* filed a brief for the Buffalo Rapids Irrigation Project et al. as *amici curiae* in Nos. 73–1380 and 73–1666. *Frank William Frisk, Jr.,* filed a brief for the American Public Power Assn. as *amicus curiae* in Nos. 73–1666 and 73–1667. *Cameron F. MacRae, Harry H. Voigt,* and *E. David Doane* filed a brief for the Edison Electric Institute as *amicus curiae* in No. 73–1667.

determine whether thermal-electric power generating plants that draw cooling water from navigable streams are subject to the licensing jurisdiction of the Federal Power Commission under Part I of the Federal Power Act, c. 285, 41 Stat. 1063, as amended, 16 U. S. C. §§ 791a–823.

I

On September 20, 1971, two Indian tribes, five individual Indians, and two environmental groups[1] (hereinafter the complainants) filed a complaint with the Commission requesting it to require 10 public utility companies located in the Southwestern United States[2] to obtain licenses for six fossil-fueled thermal-electric generating plants being constructed by the companies along the Colorado River and its tributaries.[3] The plants are part of a projected vast electric power complex, and the energy generated within this new South-

---

[1] The complainants are the Chemehuevi Tribe of Indians, the Cocopah Tribe of Indians, Emma Yazzie, Jimmy Yazzie, Paul Begay, Chester Hugh Benally, Bill Begay, the Sierra Club, and the Committee to Save Black Mesa.

[2] The companies are the Arizona Public Service Co., Southern California Edison Co., Public Service Co. of New Mexico, Salt River Project, Tucson Gas & Electric Co., El Paso Electric Co., Los Angeles Department of Water & Power, Nevada Power Co., Utah Power & Light Co., and San Diego Gas & Electric Co.

[3] The six plants are all located in or near the Four Corners area of New Mexico, Arizona, Utah, and Colorado. The Four Corners plant is located on the Navajo Indian Reservation near Farmington, N. Mex. The Mohave plant is located on patented land in Clark County, Nev. The San Juan plant is located on patented land near Farmington, N. Mex. The Huntington Canyon plant is located primarily on state and patented land in Huntington Canyon, Utah. The Navajo plant is located on the Navajo Indian Reservation near Page, Ariz. The Kaiparowits plant will be located in southern Utah near Lake Powell. At the time of oral argument all of the plants were operational except for the Kaiparowits plant, which was still in the planning stage.

western power pool will be transmitted in interstate commerce to load centers as far as 600 miles from the sites of the plants.

The six plants involved in these cases, like all thermal-electric power plants, will require large amounts of water to cool and condense the steam utilized in the process of generating electricity. See generally 1 FPC, The 1970 National Power Survey I–10–1 to I–10–20. The water needed for cooling purposes will be obtained by withdrawing substantial quantities of water from the Colorado River system. The complaint filed with the Commission asserted that it had licensing jurisdiction over the plants pursuant to § 4 (e) of Part I of the Federal Power Act, 16 U. S. C. § 797 (e), because all six plants are "project works" for the development, transmission, and utilization of power across and along navigable waters, and because two of the plants will use "surplus water" impounded by a Government dam.[4]

The Commission on November 4, 1971, issued an order dismissing the complaint for lack of jurisdiction. The

---

[4] Section 4 (e) provides in part that the Federal Power Commission is authorized and empowered:

"To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided . . . ."

Commission stated that "the legislative history [of the original Federal Water Power Act] shows that it was not intended that the licensing of thermal stations be included. This construction of the Commission's licensing jurisdiction under Part I of the Federal Power Act has been the long-standing interpretation of the Commission [and] has been recognized favorably by the Supreme Court." 46 F. P. C. 1126, 1127 (citations omitted).

Following denial by the Commission of an application for a rehearing, 46 F. P. C. 1307, the complainants filed a petition in the Court of Appeals for the District of Columbia Circuit to review the Commission's order. The Court of Appeals undertook a scholarly and comprehensive review of the executive and legislative antecedents of the Federal Water Power Act of 1920, and traced in detail the Act's legislative history and the administrative and judicial interpretations of the Act since its passage. 160 U. S. App. D. C. 83, 489 F. 2d 1207. Based on this voluminous material, the Court of Appeals affirmed the Commission's conclusion that thermal-electric plants are not "project works" under § 4 (e) and that the Commission's licensing jurisdiction under the clause extends only to hydroelectric generating plants. "Steam plants," the court held, "were purposely omitted from the congressional scheme." 160 U. S. App. D. C., at 107, 489 F. 2d, at 1231. The Court of Appeals also held, however, that the Commission's licensing authority under the "surplus water" clause of § 4 (e) is not similarly limited. The use of "surplus water" for cooling purposes by thermal-electric generating plants is sufficient, the court concluded, to bring those plants within the Commission's licensing jurisdiction. 160 U. S. App. D. C., at 111–117, 489 F. 2d, at 1235–1241. Accordingly, the court remanded the case to the Commission to determine in the first instance whether any of the six plants involved in this case fall

under that branch of its licensing authority. *Id.*, at 118, 489 F. 2d, at 1242. We granted the parties' petitions for writs of certiorari to consider the important questions of statutory construction presented by this litigation. 417 U. S. 944.

## II

The question whether thermal-electric generating plants are subject to the licensing jurisdiction of the Commission involves no issue as to the extent of congressional power under the Commerce Clause. It is well established that the interstate transmission of electric energy is fully subject to the commerce power of Congress. *FPC* v. *Union Electric Co.*, 381 U. S. 90, 94; *Public Utilities Comm'n* v. *Attleboro Steam & Elec. Co.*, 273 U. S. 83, 86; *Electric Bond & Share Co.* v. *SEC*, 303 U. S. 419, 432–433. And it is equally clear that projects generating energy for interstate transmission, such as the six plants involved in this case, affect commerce among the States and are therefore within the purview of the federal commerce power, regardless of whether the plants generate electricity by steam or hydroelectric power. *FPC* v. *Union Electric Co.*, *supra*, at 94–95; see *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 40–41; *Katzenbach* v. *McClung*, 379 U. S. 294, 301–304. The only question before us is whether Congress has exercised that power in Part I of the Federal Power Act by requiring a license for the construction and operation of thermal-electric power generating plants that withdraw large quantities of water from navigable waters for cooling and other plant purposes.

## A

Consideration of the Commission's statutory licensing authority under Part I of the Federal Power Act must, of course, begin with the language of the Act itself. Section 4 (e), 16 U. S. C. § 797 (e), authorizes the Com-

mission to issue licenses to individuals, corporations, or governmental units organized for the purpose of constructing "project works necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction . . . or for the purpose of utilizing the surplus water or water power from any Government dam . . . ." Section 23 (b) of the Act, 16 U. S. C. § 817, in turn, prohibits the unlicensed construction of such works on any navigable stream as well as the unlicensed utilization of the surplus water from a Government dam for the purpose of developing electric power.[5] "Project" is defined as the complete unit of development of a power plant, 16 U. S. C. § 796 (11); and "project works" means the physical structure of a project. § 796 (12).

Emphasizing that these provisions do not require that the project works be used to generate "hydroelectric power," but rather merely "power," the complainants assert that the six thermal-electric power plants in this case fall squarely within the statutory language defining the Commission's licensing jurisdiction. Each of the thermal-electric facilities undoubtedly qualifies as a "complete unit of development of a power plant." The physical structure of each "project" therefore must be

---

[5] Section 23 (b) provides in part:

"It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter."

"project works." All concede that the plants are located on navigable waters and are engaged in the development of electric power. Furthermore, water is an integral part of the generation of electricity at the plants, being used to condense the steam which turns the turbines. The complainants assert that it is "equally indisputable" that the six plants are using "surplus water . . . from [a] Government dam" for the purpose of developing electric power.[6]

So long as adherence to the literal terms of a statute does not bring about a result completely at variance with the purpose of the statute, the complainants argue, there is no justification for resorting to extrinsic aids such as legislative history to determine congressional intent. And since modern methods of operating thermal-electric power generating plants present an even greater threat to the conservation and orderly development of the power potential in navigable streams than do the operations of hydroelectric projects,[7] they argue that recognition of the Commission's licensing jurisdiction over thermal-

---

[6] The Court of Appeals did not attempt to define "surplus water" and did not decide whether the six plants involved in this case are within the Commission's licensing jurisdiction under that clause. Instead, the court remanded the case to the Commission "to determine in the first instance whether the plants involved in this appeal fall within the category asserted by [the complainants]." 160 U. S. App. D. C. 83, 118, 489 F. 2d 1207, 1242.

[7] Thermal-electric generating plants used 120 billion gallons of water per day for cooling purposes in 1971, compared to approximately 178 million gallons of cooling water needed on a daily basis in 1920. See id., at 105–106, n. 111, 489 F. 2d, at 1229–1230, n. 111. Largely for environmental reasons, many modern steam plants evaporate a significant amount of the water withdrawn for cooling purposes instead of returning it to the water source. Cf. N. Fabricant & R. Hallman, Toward a Rational Power Policy: Energy, Politics, and Pollution 99–101 (1971). Permanent loss of large quantities of water can obviously have a significant adverse effect on the "power potential" of the Nation's waterways.

electric plants will actually advance the principal purposes of the Act.

The complainants' reliance on the literal language of § 4 (e) and on the so-called "plain meaning" rule of statutory construction is not entirely unpersuasive. But their assertion that thermal-electric power plants drawing cooling water from navigable streams are unambiguously included within the Commission's licensing jurisdiction is refuted when § 4 (e) is read together with the rest of the Act, as, of course, it must be. See, *e. g.*, *Chemical Workers* v. *Pittsburgh Glass,* 404 U. S. 157, 185; *United States* v. *Boisdoré's Heirs,* 8 How. 113, 122.

Section 4 (e) itself refers to "dams, water conduits, reservoirs, power houses, transmission lines, or other project works." The terms that precede "other project works," and which therefore indicate a congressional intent to limit the breadth of that general phrase, see *Gooch* v. *United States,* 297 U. S. 124, 128, refer to features ordinarily associated with hydroelectric facilities. The definition of "project" in 16 U. S. C. § 796 (11) similiarly refers to structures normally found in hydroelectric power complexes: a "project" is the "complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith . . . ." Although the complainants note that a power development utilizing steam as a generating force could have many of the same structures, that possibility only serves to emphasize the ambiguity latent in the seemingly clear language chosen by Congress to define the extent of the Commission's licensing authority.

Other provisions of the Act make more apparent the limitations intended by Congress upon the reach of

§ 4 (e). The Act itself was originally entitled the Federal *Water* Power Act, 41 Stat. 1077 (emphasis added); [8] and the preamble to the Act specified that one of its primary purposes was the development of water power. *Id.,* at 1063. In addition, § 4 (a) of the Act, 16 U. S. C. § 797 (a), authorizes the Commission to conduct investigations concerning "the *water-power* industry and its relation to other industries and to interstate or foreign commerce" (emphasis added); § 4 (g), 16 U. S. C. § 797 (g), authorizes the Commission to investigate the proposed occupancy of public lands for the development of electric power and to issue such orders as are necessary "to conserve and utilize the navigation and *water-power* resources of the region" (emphasis added). Similarly, § 10 (a) of the Act, 16 U. S. C. § 803 (a), provides that *all* licenses issued under the Act shall be on the condition that the project adopted will be best adapted to a comprehensive plan "for the improvement and utilization of *water-power* development" (emphasis added).

In none of these statutory provisions is there any reference to the development or conservation of steam power, despite the fact that in 1920, as today, thermal-electric generating plants produced the greatest portion of this

---

[8] "The principal use to be developed and regulated in the Act, as its title indicates, was that of hydroelectric power to meet the needs of an expanding economy." *FPC* v. *Union Electric Co.,* 381 U. S. 90, 99. The title was changed in 1935 to the Federal Power Act to reflect the expanded duties of the Federal Power Commission under Title II of the Public Utility Act of 1935, 49 Stat. 838, as amended, 16 U. S. C. §§ 792–825u. The 1935 Act added Parts II and III to the Federal Power Act to regulate the interstate transmission and sale of electricity. See 16 U. S. C. §§ 824–825u. The original Federal Water Power Act became Part I of the Federal Power Act.

Nation's electric energy.[9] The explicit references to hydroelectric power, and the absence of any such references to steam power, manifest the limited scope of the Act's underlying purpose: "the comprehensive development of water power." *FPC* v. *Union Electric Co.*, 381 U. S., at 101.

## B

Although the language of § 4 (e) itself could nonetheless be interpreted as extending the Commission's licensing jurisdiction to include thermal-electric power plants located on navigable streams, the legislative history of the Act conclusively demonstrates that Congress intended to subject to regulation only the construction and operation of hydroelectric generating facilities.

In 1918 [10] an administration bill prepared by the Secretaries of War, Interior, and Agriculture, containing most of the provisions eventually included in the Federal Water Power Act of 1920, was introduced in Congress.

---

[9] In 1920 approximately 70% of the electricity generated in the United States was produced by steam power. 1 FPC, National Power Survey 63 (1964).

[10] The opinion of the Court of Appeals contains an exceedingly thorough analysis of the attempts by the Congress and the Executive to control the development of the power potential of the Nation's waterways in the years prior to 1918.' 160 U. S. App. D. C., at 91–96, 489 F. 2d, at 1215–1220. See also J. Kerwin, Federal Water-Power Legislation (1926); Pinchot, The Long Struggle for Effective Federal Water Power Legislation, 14 Geo. Wash. L. Rev. 9 (1945). That analysis reveals that the only segment of the power industry intended to be affected by those early federal regulatory initiatives was the construction and maintenance of hydroelectric facilities. Referring to those early legislative proposals, the special House Committee on Water Power stated that "[t]he subject of water-power legislation with a view to the development of *hydroelectric power* has been a matter of very great public interest for a number of years." H. R. Rep. No. 715, 65th Cong., 2d Sess., 15 (emphasis added).

H. R. 8716, 65th Cong., 2d Sess. In a letter to Representative T. W. Sims, Chairman of the special House Committee on Water Power, which had held hearings on the bill, the Secretaries made it plain that only hydroelectric projects were intended to be covered by the legislation:

> "It is understood your committee will take action at an early date upon various proposals which have been made concerning water-power legislation. On account of the conditions now affecting the power industry and the need of maintaining our entire industrial machinery at its highest efficiency, a satisfactory solution of the water-power problem is, in our judgment, one of the most important steps for the consideration of this Congress and one which should receive attention at the earliest practicable date.

> . . . . .

> "While the form of bill which has been presented for your consideration is directly concerned with water-power development only, an adequate solution of this problem will have a favorable and stabilizing effect upon the whole power industry. Probably no considerable increase in new water-power development can be expected immediately, but legislation is urgently needed in order to put existing water-power developments, which have been made under inadequate law, into a position of security which will enable them to make extensions and to meet maturing obligations upon favorable terms.

> . . . . .

> "Water power legislation should have in view not only the maintenance of the rights of the public in the national resources, but also the adequate protection of private capital by which such resources are developed. The bill before you aims to do

both." H. R. Rep. No. 715, 65th Cong., 2d Sess., 29.

The committee report on H. R. 8716 reflected the administration's theory that the legislation was designed "to provide for the development of hydroelectric power by private capital." H. R. Rep. No. 715, *supra*, at 15.[11] Despite the committee's recommendation, the bill failed to pass the 65th Congress because of a Senate filibuster. See *FPC* v. *Union Electric Co.*, 381 U. S., at 102 n. 18.

The administration bill was reintroduced in the 66th Congress. The House Committee on Water Power again recommended approval to meet "the need for legislation for the development of hydroelectric power . . . ." H. R. Rep. No. 61, 66th Cong., 1st Sess., 4.[12] The Senate

---

[11] The House report accompanied S. 1419. The Committee on Water Power proposed substituting the provisions of the administration bill, H. R. 8716, for those originally contained in S. 1419. The report of the Senate Commerce Committee to accompany the original version of the Senate bill stated that S. 1419 provided for "the development of hydroelectric energy produced by utilization of water power." S. Rep. No. 179, 65th Cong., 2d Sess., 2.

[12] The House report added that the need for water power legislation "is clearly set forth by Secretary [of Agriculture] Houston in a recent report." H. R. Rep. No. 61, 66th Cong., 1st Sess., 4. In the report, Secretary Houston had explained to the House:

" 'The exigencies of war brought to light defects in our national utilization of power which had not been fully realized. Operating under statutes enacted when the electrical industry was in its infancy, we had permitted our vast water-power resources to remain almost untouched, turning to coal and oil as the main source of power; for steam power could be developed more quickly and easily with fewer legal restrictions and with greater security to the investment. . . . The power requirements of this country will not be met until we develop our water powers, tie them in with steam plants located at the mine itself and operate all in great interstate systems. These considerations were presented before the special committee of the House of Representatives in the hearings held on the water-power bill during the last Congress. The need of adequate legislation is no less urgent now.' " *Id.*, at 4–5.

Committee on Commerce also recommended adoption of the bill in view of "the need for or the beneficent results to come from water power development." S. Rep. No. 180, 66th Cong., 1st Sess., 2. After compromise between the House and Senate on matters unrelated to the issue before us, see H. R. Conf. Rep. No. 910, 66th Cong., 2d Sess., this bill was enacted as the Federal Water Power Act of 1920.

Although the legislative history of the Act reveals an ambitious attempt by Congress to provide for comprehensive control over a large number of uses of the Nation's water resources, there is simply no suggestion in any of the legislative materials that the bill would authorize the new Commission to license the construction or maintenance of thermal-electric power plants. "The principal use to be developed and regulated in the Act," this Court explained in *FPC* v. *Union Electric Co., supra,* at 99, "was that of *hydroelectric power* to meet the needs of an expanding economy." (Emphasis added; footnote omitted.) See also 381 U. S., at 115 (Goldberg, J., dissenting).

## C

The limited scope of the § 4 (e) licensing authority, reflected in both the text of the Act and its legislative history, is reinforced by the Commission's consistent interpretation of that authority as not including jurisdiction over the construction and operation of thermal-electric power plants. In its First Annual Report to Congress, the Commission concluded that Congress intended only to give it licensing authority with respect to hydroelectric projects:

> "On neither the public lands and reservations nor on the waters of the United States is the jurisdiction of the Federal Power Commission as broad as the jurisdiction of Congress. The latter has authority

over all forms of use; *the Commission is limited to the consideration of projects designed to produce water power.* Structures or diversions having any other purpose, unless incidental to works constructed for power purposes or a necessary part of a comprehensive scheme of development, are not within the jurisdiction of the Commission." FPC, First Annual Report 51–52 (emphasis added).[13]

Ever since that first report in 1921, the Commission has consistently maintained the position that its licensing authority extends only to hydroelectric projects.[14] Such a longstanding, uniform construction by the agency charged with administration of the Federal Power Act, particularly when it involves a contemporaneous construction of the Act by the officials charged with the re-

---

[13] The First Annual Report to Congress also contained an opinion from the Commission's chief counsel concluding that the agency lacked jurisdiction to approve a right of way over public lands for a transmission line that would transmit electricity generated by a steam plant:

"I think it is fairly to be inferred from the context, as well as the circumstances surrounding the enactment of the legislation, that it was the purpose of Congress to confer exclusive jurisdiction on the Federal Power Commission, except as provided therein, over the matter of issuing licenses for power projects, or parts thereof, for the development of hydroelectric power, and that it was not intended to vest the Commission with jurisdiction over the public lands for other purposes. If this view be correct, it follows that where a proposed transmission line is in no way connected with a water-power project the Commission is without jurisdiction to license the same." FPC, First Annual Report 156.

[14] The Commission's view of the limited scope of its licensing jurisdiction has been restated in most of its annual reports to Congress. See, *e. g.,* 1935 Annual Report 1; 1940 Annual Report 1–3; 1946 Annual Report 1–3; 1950 Annual Report 3; 1956 Annual Report 3, 5; 1959 Annual Report 4; 1962 Annual Report 8, 12–13; 1964 Annual Report 10–11, 13; 1966 Annual Report 8–9, 13; 1969 Annual Report 25; 1972 Annual Report 26–27.

sponsibility of setting its machinery in motion, is entitled to great respect. *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 210; *Udall* v. *Tallman*, 380 U. S. 1, 16; *Power Reactor Development Co.* v. *Electrical Workers*, 367 U. S. 396, 408.

The deference due this longstanding administrative construction is enhanced by the fact that Congress gave no indication of its dissatisfaction with the agency's interpretation of the scope of its licensing jurisdiction when it amended the Act in 1930, c. 572, 46 Stat. 797,[15] or when it re-enacted the Federal Water Power Act as Part I of the Federal Power Act in 1935.[16]   See *Saxbe* v. *Bustos*, 419 U. S. 65; *Cammarano* v. *United States*, 358 U. S. 498, 510–511; *Massachusetts Mutual Life Ins. Co.* v. *United States*, 288 U. S. 269, 273.   Indeed, on several occasions the Commission has supported legislative proposals to expand its jurisdiction to encompass licensing authority over the construction and operation of thermal-electric generating plants but has been unable to persuade Congress to act favorably on these proposed amendments to the Act.   See 1962 Annual Report 12–13; 1964 Annual Report 10–11; 1966 Annual Report 8–9.

## D

The conclusion that Congress did not intend to give the Commission   licensing   jurisdiction   with   respect   to

---

[15] In 1930 a Reorganization Act was enacted to improve the functioning of the Commission by making it an independent agency with authority to employ its own full-time staff.   46 Stat. 797, codified, as amended, at 16 U. S. C. §§ 792, 793, 797 (d).

[16] Title II of the Public Utility Act of 1935, 49 Stat. 838, expanded the functions of the Federal Power Commission by authorizing the regulation of the interstate transmission and sale of electricity.   The Commission's new regulatory powers were codified as Parts II and III of the new Federal Power Act.   See 16 U. S. C. §§ 824–825u. The original Federal Water Power Act became Part I of the new

thermal-electric power plants is also supported by this Court's decision in *FPC* v. *Union Electric Co.*, 381 U. S. 90. The Court there sustained the Commission's position that a license was required under the Act to construct a pumped-storage hydroelectric plant to be located on a nonnavigable stream. Although the plant did not affect commerce on navigable waters, its generation of electricity for interstate transmission would affect "the interests of interstate or foreign commerce" within the meaning of § 23 (b) of the Act, 16 U. S. C. § 817, the Court held, and therefore a license was required. The Union Electric Co., arguing that the Commission lacked licensing authority, asserted that there was no difference between the generation of energy by a thermal-electric power plant and by a hydroelectric project in terms of impact on interstate commerce that could justify a distinction in jurisdictional treatment. Accordingly, if impact on commerce in general, rather than on commerce on navigable waters, was the criterion for Commission jurisdiction, argued Union Electric, steam plants, as well as its pumped-storage hydroelectric plant, should be subject to licensing under Part I of the Federal Power Act.

The Court found the answer to this argument in the fact that, even though not located on a navigable stream, Union Electric's generating plant produced electricity by harnessing water power: Unlike Parts II and III of the Federal Power Act, "under which the Commission regulates various aspects of the sale and transmission of energy in interstate commerce, Part I, the original Fed-

---

Federal Power Act. Despite the breadth of the additional powers given the Commission, its authority under the licensing provisions of the Federal Water Power Act remained virtually unchanged. See H. R. Rep. No. 1318, 74th Cong., 1st Sess., 7; cf. *FPC* v. *Union Electric Co.*, 381 U. S. 90, 91 n. 2.

eral Water Power Act, is concerned with the utilization of water resources and particularly the power potential in water. In relation to this central concern of the Act, the distinction between a hydroelectric project and a steam plant is obvious, and meaningful, although both produce energy for interstate transmission." 381 U. S., at 110 (footnotes omitted). See also *id.*, at 115 (Goldberg, J., dissenting): "The legislative history here, however, establishes to my satisfaction that [Congress] has required licenses of neither steam plants nor the type of hydroelectric plant here involved, and in light of this legislative history I agree with the Court of Appeals that Congress intended that a license be required only where the interests of commerce on navigable waters are affected." (Footnote omitted.)

### III

For the above reasons we agree with the conclusion of the Court of Appeals that the structures composing thermal-electric power plants are not "project works" required to be licensed by the Commission. The Court of Appeals went on to hold, however, that the surplus water clause of § 4 (e) authorizes the Commission to license the use of such water not only for the development of hydroelectric energy but also for cooling purposes in thermal-electric power plants, finding that the surplus water provision was intended to serve broader interests than the project works clause of the same subsection of the Act. "It reflects an explicit concern with utilizing water resources to defray the cost of waterway improvements as well as a concern with comprehensive water resource management. It empowers the FPC to license the use of either 'surplus water' or 'water power' from *any* Government dam, and thus is not limited to the mere leasing of excess Government water power. . . . [T]he addition of the words 'surplus water' in [§ 4 (e)]

was intended to afford the FPC a broad licensing authority over federally controlled waters . . . . The FPC could license either the use of 'water power'—*i. e.,* electricity actually generated by the Government—or the use of 'surplus water' for the private generation of water power or other purposes." 160 U. S. App. D. C., at 116–117, 489 F. 2d, at 1240–1241. We cannot agree with this conclusion of the Court of Appeals with respect to the "surplus water" clause of § 4 (e), because we can find no support for it in the text, in the legislative history, or in the administrative interpretation of Part I of the Federal Power Act.

The original title, preamble, and text of Part I of the Federal Power Act provide strong evidence that Congress intended to restrict the Commission's licensing jurisdiction with respect to the power industry to the construction and maintenance of hydroelectric facilities. See *supra,* at 403–404. Nothing in the language of the Act suggests that the surplus water clause was designed to be an exception to the Act's limited scope and purpose.[17] Similarly, from 1921 to the present the Commission has consistently interpreted its licensing authority as being "limited to the consideration of projects designed to produce water power." FPC, First Annual Report 51. See *supra,* at 408–409. No exception has ever been recog-

---

[17] In fact, § 23 (b) of the Act, 16 U. S. C. § 817, makes it unlawful for an unlicensed party "for the purpose of developing electric power, to . . . utilize the surplus water or water power from any Government dam." Although the use of cooling water by thermal-electric power plants is necessary to increase the efficiency of the generating process, see 160 U. S. App. D. C., at 108 n. 128, 489 F. 2d, at 1232 n. 128, it is most natural to read § 23 (b)'s reference to using water "for the purpose of developing electric power" to mean harnessing the power of falling water to produce electric energy. The "plain meaning" of § 23 (b), therefore, would seem to limit the scope of the Commission's licensing jurisdiction under the surplus water clause to hydroelectric facilities.

nized by the Commission for thermal-electric power plants using surplus water from Government dams.

The Court of Appeals' own extensive analysis of the general background and legislative history of the Federal Water Power Act conclusively demonstrates that Congress intended the Act as a whole, not merely the project works clause, to subject to regulation only that segment of the power industry involving the construction and operation of hydroelectric generating facilities. See 160 U. S. App. D. C., at 91–109, 489 F. 2d, at 1215–1233; cf. *supra*, at 405–408. More importantly, the legislative history pertaining to the surplus water clause itself indicates that that clause, like the rest of the Act, relates to the conservation and development of only hydroelectric power.

The phrase "surplus water or water power from any Government dam" had its origins in legislation enacted during the late 19th and early 20th centuries, conferring on the Secretary of War the authority to lease at individual dam sites excess water for power development.[18] The term "surplus water" in those statutes always referred to its use for the development of water power.[19]

---

[18] For example, the Act of Aug. 11, 1888, 25 Stat. 400, provided in part: "[T]he Secretary of War is hereby authorized and empowered to grant leases or licenses for the use of the *water powers* on the Muskingum River at such rate and on such conditions and for such periods of time as may seem to him just, equitable, and expedient: *Provided,* That the leases or licenses shall be limited to the use of the *surplus water* not required for navigation." *Id.,* at 417 (emphasis added). See also Act of Sept. 19, 1890, c. 907, 26 Stat. 426, 447; Act of June 13, 1902, 32 Stat. 331, 358, as amended, Act of June 28, 1902, 32 Stat. 408, 409; Act of Mar. 6, 1906, 34 Stat. 52; Act of Apr. 23, 1906, 34 Stat. 130; Act of May 9, 1906, 34 Stat. 183, 184; Act of June 25, 1906, c. 3530, 34 Stat. 456, 457; Act of Mar. 4, 1907, 34 Stat. 1288; Act of Mar. 3, 1909, 35 Stat. 815, 819.

[19] The complainants note that in other legislation before the beginning of the 20th century Congress had used the term "surplus

In 1914 the Adamson bill, H. R. 16053, 63d Cong., 2d Sess., was introduced to amend the Dam Act, 34 Stat. 386, by providing for the comprehensive regulation of water power development on navigable streams. Section 14 of the bill, the antecedent of § 4 (e)'s surplus water clause, authorized the Secretary of War to lease "the right to develop power from the surplus water over and above that required for navigation at any navigation dam now or hereafter constructed . . . and owned by the United States . . . ." 51 Cong. Rec. 11415. The report of the House Committee on Interstate and Foreign Commerce [20] and congressional debate on § 14 plainly indicate that only water power uses of surplus water were to be regulated.[21] Steam power was mentioned only as a com-

---

water" in contexts that could not possibly refer solely to the development of hydroelectric power. *E. g.*, 19 Stat. 377, c. 107, as amended, 43 U. S. C. § 321, reserving for public use "all surplus water" not actually used for irrigation and reclamation on desert land entered by private individuals. But the relevant statutory history clearly indicates that when the term "surplus water" was used in conjunction with "water power" or "surplus water power," as in § 4 (e) of Part I of the Federal Power Act, that term always referred to the use of such water for the development of hydroelectric power.

[20] The House Committee reported that:

"Section 14 is a new section authorizing the Secretary of War, with the approval of the Chief of Engineers, to lease to any applicant who has complied with the laws of the State in which the dam may be located, any surplus power developed by a dam that is constructed or owned by the United States for the purposes of navigation." H. R. Rep. No. 592, 63d Cong., 2d Sess., 6.

[21] See, *e. g.*, 51 Cong. Rec. 11403 (remarks of Rep. Mann): "We have many navigation dams in the United States. At many of them there is surplus water which may be used for the development of water power, and we authorize the Secretary of War to lease that surplus water power and to make charges for it." See also 51 Cong. Rec. App. 768 (remarks of Rep. Brown).

peting source of electric energy, with no consideration given to its regulation.[22]

Section 14 was amended on the floor of the House to limit the duration of the leases authorized to 50 years. The amendment also changed the surplus water language of the section so that it closely resembled the language later adopted in the Federal Water Power Act: amended § 14 authorized "leases for the use of *surplus water and water power* generated at dams and works constructed wholly or in part by the United States in the interest of navigation . . . ." 51 Cong. Rec. 13255 (emphasis added). The change in language was not intended to broaden the scope of the surplus water clause. See *id.*, at 13257.

The Senate Commerce Committee reported out a substitute bill, S. 6413, 63d Cong., 2d Sess., rather than the amended Adamson bill. Like the House bill, S. 6413, containing another version of a surplus water clause,[23] was directed only to "[t]he question of *water-power development* by the construction of dams across navigable streams and the improvement of navigation in connection with water-power development." S. Rep. No. 846, 63d Cong., 3d Sess., 1 (emphasis added). Neither bill, however, was enacted during the 63d Congress.

Similar bills were introduced in the 64th and 65th Congresses. Again, nothing in the language or reports on any of that proposed legislation indicated that the licensing authority to be created would extend to the

---

[22] See, *e. g., id.*, at 12336 (remarks of Rep. Underwood); *id.*, at 12593 (remarks of Rep. Bryan); *id.*, at 12777 (remarks of Rep. Rainey).

[23] Section 10 of the Senate bill authorized the Secretary of War to lease "the right to utilize the surplus water over and above that required for navigation at any [federal] navigation dam . . . ." S. 6413, 63d Cong., 2d Sess.

use of "surplus water" by steam plants. Section 10 of the Shields bill, S. 3331, 64th Cong., 1st Sess., for example, authorized the Secretary of War to lease "the right to utilize the surplus water power over and above that required for navigation at any navigation dam now or hereafter constructed . . . ." 53 Cong. Rec. 2198. The House Committee on Interstate and Foreign Commerce struck S. 3331 in its entirety and substituted a new bill. Section 19 of that bill, identical to § 14 of the amended Adamson bill that had been passed by the House in 1914, authorized the Secretary of War "to enter into leases for the use of surplus water and water power generated at dams and works constructed wholly or in part by the United States in the interests of navigation . . . ." H. R. Rep. No. 404, 64th Cong., 1st Sess., 6. The committee report explained that "[s]ection 19 regulates the method to be pursued by the War Department in leasing the power at dams erected in whole or in part by the Government itself." *Id.*, at 11. The section, stated the committee, "continues the method existing as to Government dams for many years, under which the War Department has satisfactorily regulated and leased surplus water at a number of such structures." *Ibid.* The "method existing," of course, provided for the lease of surplus water at individual dams for the purpose of water power development.

The administration bill considered initially by the 65th Congress, H. R. 8716, 65th Cong., 2d Sess., which as amended by that Congress and the 66th Congress became the Federal Water Power Act of 1920, contained a surplus water clause that paralleled the provisions of the earlier bills. Section 4 (d) of that bill, now § 4 (e) of the Federal Power Act, authorized the Federal Power Commission to issue licenses "for the purpose of utilizing the surplus water or water power over and above that

required for navigation at any navigation dam now or hereafter constructed . . . and owned by the United States . . . ." H. R. Rep. No. 715, 65th Cong., 2d Sess., 23. No explanation was given for substitution of the disjunctive "or" for the conjunctive "and" in the phrase "surplus water or water power," but there is nothing to indicate that the change was designed to expand the scope of surplus water licensing authority beyond that contemplated by the earlier proposed legislation. To the contrary, testimony given during the extensive hearings conducted by the special House Committee on Water Power reflected the general understanding that the Commission's licensing jurisdiction would be limited to hydroelectric facilities.[24]

The administration bill, as already noted, see *supra,* at 407, was reintroduced in the 66th Congress and was enacted without any material changes in the surplus water clause as the Federal Water Power Act of 1920. As the Court of Appeals observed, see 160 U. S. App. D. C., at 112–113, 489 F. 2d, at 1236–1237, little relevant legislative history concerning the meaning of the surplus water clause was generated during the 66th Congress.

---

[24] O. C. Merrill, Department of Agriculture engineer and one of the principal draftsmen of the bill, testified in response to questioning by members of the committee as to the scope of the proposed Commission's licensing authority: "This bill is concerned only, in such instances, in the development of power. When that is done the licensee may make any other use that is available. . . . The only thing this bill is doing is to grant a license for that particular power development occupying the public lands. There is no assumption of any· control whatever over any other uses the licensee may make of that water outside of that development." Hearings on Water Power before the House Committee on Water Power, 65th Cong., 2d Sess., 93. Similarly, Representative Edward Taylor explained: "[T]his bill is for the purpose, as I understand it, of giving authority to create power and utilize water for power purposes." *Id.,* at 96.

Nevertheless, the general history of the Act demonstrates that the legislators viewed the bill as primarily regulating the development of hydroelectric power. Nothing in the record of the debates indicates that Congress intended the surplus water clause to create an exception to the limited scope and purpose of the Act or that it viewed that clause as embodying a meaning different from that of the virtually identical surplus water provisions contained in earlier legislative proposals.

The Court of Appeals based its contrary conclusion in large part on the fact that the Federal Water Power Act repealed the statutory authority for the Waterways Commission, created by the Rivers and Harbors Act of 1917. 40 Stat. 269. The court stated that "the newly created Federal Power Commission took over the planning and coordinating responsibilities of the Waterways Commission, which included consideration of a spectrum of water uses not related to water power." 160 U. S. App. D. C., at 115–116, 489 F. 2d, at 1239–1240 (footnote omitted). The court concluded from this transfer of responsibilities that the Federal Water Power Act reflected a concern with comprehensive water resource management and that the surplus water clause was intended to provide a basis for expanding governmental supervision of general water resource development and use. *Id.*, at 116–117, 489 F. 2d, at 1240–1241.

Although it is true that § 29 of the Federal Water Power Act, 41 Stat. 1077, did expressly repeal the statutory authority for the Waterways Commission, it seems evident that that repeal was not intended to transfer all of that Commission's functions to the new Federal Power Commission. The House debates clearly indicate that the Waterways Commission authority was repealed largely because that Commission was not in fact a functioning agency, and in order to prevent any possible conflict be-

tween it and the new FPC. There is no indication of any purpose to transfer the Waterways Commission's jurisdiction to the FPC. *E. g.*, 58 Cong. Rec. 2250–2251 (remarks of Rep. Anderson). In fact, a proposed amendment that would have provided for such a transfer of authority was never actually introduced in the Senate. See 59 Cong. Rec. 1173–1176 (remarks of Sens. Ashurst, Fletcher, and Ransdell). Those functions of the Waterways Commission not expressly given to the new FPC or transferred to other agencies were thus simply eliminated by § 29.[25]

Moreover, the responsibilities which the Waterways Commission did possess from 1917 to 1920, although quite broad, were investigatory, not regulatory. The Commission was authorized "to secure the necessary data, and to formulate and report to Congress . . . a comprehensive plan or plans for the development of waterways and the water resources of the United States for the purposes of navigation and for every useful purpose, and recommendations for the modification or discontinuance of any project herein or heretofore adopted." Rivers and Harbors Act of 1917, § 18, 40 Stat. 269. Accordingly, even if it could be concluded that the Waterways Commission's powers had been inherited by the FPC, that conclusion would not support recognition of Commission *licensing* jurisdiction over thermal-electric power plants using "surplus water" for cooling purposes.[26]

---

[25] Recognizing that the authority of the Waterways Commission "is very much more comprehensive and covers infinitely more ground than the water power commission created in the pending act," 59 Cong. Rec. 1176 (remarks of Sen. Ransdell), an amendment was adopted on the Senate floor to continue the existence of the Waterways Commission. *Id.*, at 1535. That amendment, however, was eliminated in conference. See H. R. Rep. No. 910, 66th Cong., 2d Sess., 13–14.

[26] The interpretation of the surplus water clause of § 4 (e) as limited to use of such water by hydroelectric facilities is reinforced

Contrary to the suggestion of the complainants, a reading of the surplus water provision as referring only to hydroelectric plants utilizing surplus water or water power from Government dams does not render that clause nugatory. First, a license to construct and operate project works does not automatically authorize use of surplus water from a Government dam. Where a project will use surplus water, the Commission may properly require a second license, which may impose additional charges or operational conditions on the licensee. Cf. *Alabama Power Co.,* 34 F. P. C. 1108; *California Oregon Power Co.,* 13 F. P. C. 1, 12–13, supplemental opinion, 15 F. P. C. 14, 18–21, petition for review dismissed, 99 U. S. App. D. C. 263, 239 F. 2d 426. Second, facilities constructed under a congressional grant issued prior to enactment of the Federal Water Power Act are exempted by § 23 (b) of the Act, 16 U. S. C. § 817, from the requirement of

---

by legislation enacted prior and subsequent to the Federal Water Power Act. For example, the Act of Feb. 25, 1920, 41 Stat. 451, 43 U. S. C. § 521, authorized the Secretary of the Interior, "in connection with the operations under the reclamation law . . . to supply water from any project irrigation system for other purposes than irrigation, upon such conditions of delivery, use, and payment as he may deem proper . . . ." Similarly, the Secretary of the Interior is authorized under the Boulder Canyon Project Act, 45 Stat. 1060, as amended, 43 U. S. C. § 617d, "to contract for the storage of water in [the Hoover Dam] reservoir and for the delivery thereof . . . for irrigation and domestic uses . . . ." The Court of Appeals recognized that those and other comparable provisions, *e. g.,* 58 Stat. 890, as amended, 33 U. S. C. § 708, demonstrate that "Congress has for a long time been concerned with the controlled disposition of surplus federal water and power, and has often expressed this concern by granting plenary control over such disposition to a federal agency." 160 U. S. App. D. C., at 118, 489 F. 2d, at 1242. But those provisions also tend to indicate that when Congress has wanted to confer the broad authority to dispose of "surplus water" for purposes other than hydroelectric power development, it has done so explicitly and unambiguously.

securing a "project works" license from the Commission during the life of the original works. See *Northwest Paper Co. v. FPC,* 344 F. 2d 47. However, if such a project should seek to utilize surplus water from a Government dam built subsequent to June 10, 1920, a surplus water clause license would be required. Finally, it is by no means irrational for Congress to provide the Commission with alternative, albeit sometimes coextensive, bases of jurisdiction, so that it can proceed on the strength of one where the existence óf the other may be unclear.

## IV

The complainants finally argue that even though it may have been proper 50 years ago to construe the Commission's licensing jurisdiction as limited to hydroelectric projects, such a construction does great violence to the policies central to the Federal Power Act in the light of modern conditions. Although in 1920 steam plants supplied the bulk of the Nation's electric power and, as today, those plants were water-cooled,[27] the complainants point to the tremendous growth in size and efficiency of the modern thermal-electric power complex and the concomitant increase during the past half century in the quantity of water used by steam plants and change in the nature of that usage.[28] Because the cool-

---

[27] See *id.,* at 107 n. 124, 489 F. 2d, at 1231 n. 124; 1 FPC, National Power Survey 63 (1964); cf. Fabricant & Hallman, *supra,* n. 7, at 52.

[28] The total generating capacity of all steam plants in the United States in 1920 was under 9000 megawatts. Edison Electric Institute, Historical Statistics of the Electric Utility Industry Through 1970, p. 4 (2d ed.). By 1970 total installed capacity of conventional steam plants was more than 275,000 megawatts. *Ibid.* Thermal-electric plants in 1971 used 120 billion gallons of cooling water per day, compared to 178 million gallons per day in 1920. See 160 U. S. App. D. C., at 105–106, n. 111, 489 F. 2d, at 1229–1230, n. 111. A substantial amount of the water used for cooling purposes by many

ing water used by the six plants involved in this case will be evaporated rather than returned to the river system,[29] those plants will withdraw permanently up to 250,000 acre feet of water annually from the Colorado River system—more water than was used by all the steam plants in the United States in 1920.[30] Unless such uses are regulated by subjecting them to the licensing jurisdiction of the Commission, the complainants argue, private power interests will succeed in appropriating the power potential in public waters, the very evil the Federal Water Power Act was designed to eliminate.

Whatever the merits of the complainants' argument as a matter of policy, it is properly addressed to Congress, not to the courts. The legislative history of the Federal Water Power Act conclusively demonstrates that in 1920 Congress intended to provide for the orderly development of the power potential of the Nation's waterways only through the licensing of hydroelectric projects. And in

---

modern steam plants is evaporated, rather than returned to the water source. Cf. Fabricant & Hallman, *supra,* n. 7, at 99–101.

[29] Congress has delegated to the Secretary of the Interior the federal authority to allocate for consumptive uses water from Government dams in the Colorado River Basin. See generally *Arizona* v. *California,* 373 U. S. 546. Because the salinity of water used for cooling purposes by thermal-electric plants is increased by reason of partial evaporation and because the downstream Colorado River system already suffers from a substantial salinity problem, the Secretary required the plants involved in this case to agree to evaporate all water used, rather than return it to the river system, as part of their contracts for the use of Colorado River water.

[30] Thermal-electric power generating plants used 178 million gallons of cooling water per day in 1920, see n. 28, *supra,* which is approximately 546 acre feet per day. (There are 325,851 gallons in an acre foot, the amount of water needed to cover an area of one acre to a depth of one foot.) The six plants involved in this case will use more than 650 acre feet of water per day. See 160 U. S. App. D. C., at 90, 489 F. 2d, at 1214.

424

1935, when the Act was re-enacted as Part I of the Federal Power Act, Congress chose not to expand the licensing authority of the Commission despite the fact that in Parts II and III of the Act, giving the Commission regulatory authority over various aspects of the transmission and sale of electric energy in interstate commerce, Congress treated the source of the energy and the method of generation as immaterial. See *FPC* v. *Union Electric Co.*, 381 U. S., at 110. Moreover, several times in recent years the Commission has sought an expansion of its licensing jurisdiction to include thermal-electric power generating plants, but Congress has failed to approve any of these proposals.

It may well be that the "obvious" distinction, recognized by Congress in 1920, in 1935, and in subsequent years of inaction, and by this Court in the *Union Electric* case, *supra*, at 110, between utilization of water resources by a hydroelectric project and a thermal-electric power plant is no longer viable. But until Congress changes the licensing provisions of Part I of the Federal Power Act, it is our duty to apply the statute as it was written and has been construed for the past 54 years.

For the foregoing reasons, the judgment before us is vacated, and the cases are remanded to the Court of Appeals with directions to enter a judgment affirming the Commission's dismissal of the complaint for lack of jurisdiction.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of these cases.