**AMOCO PRODUCTION COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Phillips Petroleum Company, Intervening Respondent.**

**No. 84–1737, 84–1986.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1985.

Decided June 20, 1985.

William H. Emerson, Standard Oil Co., Ind., Chicago, Ill., for petitioner.

Joel M. Cockrel, Washington, D.C., for F.E.R.C.

Larry Paine, Bartlesville, Okl., for Phillips Petroleum Co.

Before WOOD, CUDAHY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

This is a petition for review of several orders of the Federal Energy Regulatory Commission (the "Commission") involving the validity of a rate filing made by Amoco Production Company ("Amoco") for sale of natural gas to Phillips Petroleum Company ("Phillips"). Essentially the rate determination involved an interpretation of a 1945 contract between Amoco and Phillips on the question whether that contract permitted Amoco to collect tax reimbursement monies from Phillips as a separate addition to a base rate which already took specific account of, and included, the relevant tax payments. Amoco particularly objects that the method of computation approved by the Commission denies Amoco 100% pass-through of tax-based payments which Phillips received in turn on resale of the natural gas to Michigan-Wisconsin Pipe Line Company ("Michigan").

In 1945, Amoco entered into a contract to sell natural gas to Phillips. Phillips, in turn, after treating and processing the gas, was to resell it to Michigan under a separate contract. The base price for sale from Amoco to Phillips was to be determined by a formula in Article VII of the contract under which the key variable was the price received on resale from Phillips to Michigan.[1] Under Article VIII, Amoco was also

---

1. The formula is as follows:

$$\frac{\text{Phillips' resale price to Michigan}}{\text{Phillips' applicable base price on sales to Michigan}} \times \frac{\text{Amoco's}}{\text{base price}} = \frac{\text{Price}}{\text{Phillips pays to Amoco}}$$

*See Opinion No. 209, Opinion and Order Interpreting Contracts, Dismissing Complaint and Terminating Proceeding,* 26 FERC 61,257 (1984).

This formula summarizes the pricing provisions set forth in Article VII of the contract, which provide in pertinent part:

Section 1. Buyer agrees to pay to Seller, subject to the further provisions of this article: (a) The sum of 6.0744¢ per thousand cubic feet for all gas ... delivered hereunder during the first five (5) years following the date of first delivery of gas under this contract; the sum of 5.9940¢ per thousand cubic feet for all such gas delivered during the second five-year period following the date of the first delivery of gas under this contract; the sum of 6.3066¢ per thousand cubic feet for all such gas delivered hereunder during the third five-year period following the date of first delivery of gas under this contract; the sum of 7.1463¢ per thousand cubic feet for all such gas delivered hereunder during the fourth five-year period following the date of first delivery of gas under this contract; the sum of 7.9056¢ per thousand cubic feet for all such gas delivered hereunder during the fifth five-year period following the date of first delivery of gas under this contract; ....

Section 3. Pursuant to the provisions of· the said pipe line contract with Michigan-Wisconsin Pipe Line Company as modified by amendments thereto executed prior to January 1, 1950, Mich-

entitled to collect from Phillips 75% of any of Amoco's additional severance, production and excise taxes. Article VIII noted that Phillips, in turn, under its contract with Michigan could recover 75% of such taxes from Michigan.[2] In 1965 the agreement between Phillips and Michigan was amended to provide for reimbursement of 100% of additional taxes by Michigan to Phillips. Since Article VIII of the Amoco-Phillips contract referred specifically to the Phillips-Michigan contract, Amoco argues that its proportion of recovery should now be 100% rather than 75% as well.

After the decision in *Phillips Petroleum Company v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), which held that the Commission had jurisdiction over wellhead sales of natural gas, both Amoco and Phillips filed their gas sales contracts with the Commission and conformed the rates charged to agency regulation. The

effect of regulation was to limit the rates Amoco and Phillips could collect to the contract rate or any ceiling rate prescribed by the Commission, whichever was less. *See Federal Power Commission v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

In 1971 and 1972, Amoco filed rate changes with the Commission at the appropriate area ceiling prices then in effect.[3] Phillips protested both filings and the Commission consolidated the two matters for evidentiary hearing. The relevant issue in those proceedings was the amount to be used as the applicable Phillips resale price (to Michigan). This number was in turn the numerator in the contractual formula for determining the price Phillips was to pay Amoco. Based on contract language referring to "the price received [by Phil-

---

igan-Wisconsin has agree to pay Phillips base prices for gas delivered thereunder of 7.5930¢ per thousand cubic feet for all gas delivered during the first ten (10) years after the time of first delivery of gas thereunder and at the end of said 10-year period thereafter the price for all gas delivered thereunder will be increased .8933¢ per thousand cubic feet. *Whenever the price received by Buyer for gas delivered by it at any time under said pipe line contract from reserves covered by said contract as amended by 'Amendatory Agreement' dated August 9, 1948, and 'Amendatory Agreement' dated December 1, 1948, shall as a result of any past or future amendment of the price provisions of said contract, the operation of the escalation provisions thereof or by virtue of an order of the Federal Power Commission or by operation of law or order of any other governmental agency having jurisdiction in the premises or for any other reason become higher than the applicable base price as hereinabove specified in this Section 3, or while so higher be raised or lowered, the applicable price as stipulated in Sections 1 and 2 of this Article VII shall be adjusted upward or downward as the case may be to an amount which bears the same relationship to the applicable price stipulated in said Sections 1 and 2 of this Article VII which the price received by Buyer bears to the applicable base price as set forth in this Section 3;* provided, however, that the adjusted applicable price which may be effective hereunder shall never be less than the applicable price as specified in Sections 1 and 2 of Article VII. (Emphasis added.)

2. The tax reimbursement provision, entitled "Taxes," is Article VIII of the contracts. It provides:

Seller shall pay all present and future property taxes on its leases and facilities, except future increases in gross production taxes levied in lieu of property taxes, and shall pay all gross production taxes, severance taxes and other excise taxes levied at the rates now existing upon or in respect of the gas delivered hereunder up to the point of delivery of the gas to Buyer. *It is understood that Buyer's proposed contract with Michigan-Wisconsin Pipe Line Company will provide that the latter shall assume three-fourths (¾) of all increases above the present rates of gross production taxes, severance taxes and excise taxes upon or in respect of the gas delivered hereunder and taken by said pipe line company or upon or in respect of the production or handling thereof and Buyer hereby agrees to assume three-fourths (¾) of all increases above the present rates of such taxes upon or in respect of gas deliveries hereunder and disposed of in other markets or used by Buyer. It is agreed that the remaining one-fourth (¼) of all such increases shall be borne by Seller herein.* The term "excise taxes" as used in this section shall not include any taxes based on income, profits or the right to exercise the corporate franchise of Seller, all of which and all increases in which shall be paid by Seller. (Emphasis added).

3. The area ceilings were established in Opinion No. 586, *Just and Reasonable Rates for Natural Gas Produced in the Hugoton-Anadarko Area,* 44 FPC 761 (1970).

lips]," the Administrative Law Judge (the "ALJ") held that the numerator in the formula was, as Phillips had argued, the price actually received by Phillips from Michigan—a regulatory ceiling price, not, as Amoco had argued, a higher contract price. In his Findings and Conclusions the ALJ, using the contractual formula, found that Amoco was entitled to charge Phillips certain amounts calculated "under Section 3 of Article VII of the Amoco-Phillips gas sale contract *exclusive of tax reimbursement.*" ALJ Initial Decision, Nos. RI 71–691, RI 73–70 (April 1, 1974) (emphasis supplied).

The Commission affirmed and adopted the ALJ's decision but modified it to hold that only during the period covered by *one* rate filing (January, 1971—June, 1972) was the proper numerator in the formula in fact the appropriate area ceiling rate. The Commission said, however, that after July 1, 1972, the proper numerator was the contract rate from Michigan since it was lower than the increased area ceiling. The Commission stated:

> From January 12, 1971, until July 1, 1972, Phillips collected the area ceiling rate prescribed in Opinion No. 586 for the resale of the subject gas. On July 1, 1972, Phillips commenced the collection of its contract rate of 16.22 cents per Mcf, plus applicable tax reimbursement, without refund obligation.

*Order Affirming and Adopting Initial Decision with Modification,* 52 FPC 889, 891 (1974).

In 1976, Amoco filed a new rate using as the Phillips' resale price in the contract formula the applicable rates set forth in a Commission national rate-making order, Opinion No. 749, *Just and Reasonable Rates,* 54 FPC 3090 (1975) ("Opinion No. 749"). In addition to this base rate, Amoco's notice included a separate component for tax reimbursement. The claim for the component for tax reimbursement was made pursuant to Article VIII of the Amoco-Phillips contract, which, as noted, provided that 75% of applicable tax increases would be collected by Phillips from Michigan and passed on to Amoco, which paid

the taxes. Amoco treated the 75% as having been amended to 100% as the result of the 1965 amendment to Phillips' contract with Michigan.

Phillips objected to the tax reimbursement component, pointing out that under Opinion No. 749 it was permitted to collect only the ceiling rate set by the Commission. This was a primarily cost-based rate which included tax adjustment. Phillips argued that, since it collected no separate monies from Michigan earmarked for tax reimbursement, no additional monies were due to Amoco. Subsequently, Amoco filed a complaint asking that the Commission direct Phillips to pay the separate tax reimbursement and Phillips reiterated its defense characterizing the tax reimbursement component as a nullity.

In *Opinion No. 209, Opinion and Order Interpreting Contracts, Dismissing Complaint and Terminating Proceeding,* 26 FERC ¶ 61,257 (1984), the Commission dismissed Amoco's complaint, holding that since Amoco was compensated for tax reimbursement as part of the rate paid by Phillips under the formula (based on the amounts paid in turn by Michigan to Phillips), a *separate* tax component increment would be a double recovery. The Commission said that such an increment was not authorized by the underlying contract and was null and void. Both Amoco and Phillips filed applications for rehearing—Amoco challenging the decision and Phillips seeking refund of rate overpayments since 1980. In *Opinion No. 209–A, Opinion and Order on Rehearing,* 27 FERC ¶ 61,-144 (1984), the Commission denied Amoco's rehearing application and granted Phillips'.

## II.

This case involves an interpretation of Section 3 of Article VII of the 1945 contract between Amoco and Phillips, which provided for a gas "price" to be derived by a formula based on the "price received" by Phillips in its contract with Michigan. It also involves the apparent right of Amoco to recover under Article VIII of its contract with Phillips either 75% or 100% of the

*increases* in Amoco's severance, production and excise taxes paid to the states of Texas and Oklahoma. Although the Commission's decision turned primarily on its refusal to interpret the contract to allow a "double recovery" of taxes, Amoco's primary complaint is that, as a result of the Commission determination, it is denied the right allegedly guaranteed by Article VIII of the contract to be reimbursed for 100% of the increase in taxes paid. Amoco also asserts that it is entitled to full tax reimbursement under applicable statutes and Commission regulations.

■ The ultimate issue here is a matter of contract interpretation. We owe some deference to the Commission as an expert body dealing regularly with natural gas supply contracts. *See Alexander v. Federal Energy Regulatory Commission,* 609 F.2d 543, 547–48 (D.C.Cir.1979). Nonetheless, our deference is not nearly so marked as it would be in reviewing a purely regulatory determination of the Commission, where the substantial evidence standard or the arbitrary and capricious rule might apply. *See, e.g., United Gas Pipe Line Co. v. Federal Energy Regulatory Commission,* 657 F.2d 790 (5th Cir.1981). Our task is to find whether the Commission's interpretation of the contract was reasonable and in full conformance with law. *See Texas Gas Transmission Corp. v. Shell Oil Corp.,* 363 U.S. 263, 268–69, 80 S.Ct. 1122, 1125–26, 4 L.Ed.2d 1208 (1960).

■ The basic reason for the difficulties of interpretation encountered in this case was the introduction after 1954 of regulated, primarily cost-based pricing of gas at the wellhead. Regulated pricing before passage of the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432, took essentially two forms: area pricing and national pricing. Both of these methodologies were in essential thrust cost-based and amounts attributable to severance, production and excise taxes appeared as an integral ingredient of the regulatory ceiling price developed for various categories of natural gas. When this ceiling price became the "price received" by Phillips from Michigan (as is

the case for all gas in issue here), it is fair to say that all relevant taxes were recovered by Phillips from Michigan. The amount of these taxes also, as part of the "price received," became part of the contract formula to determine the price paid Amoco by Phillips. Hence, through the workings of the formula, a major part of the taxes, at least, were recovered by Amoco.

The use of a regulated and primarily cost-based price charged by Phillips to Michigan introduced a situation which was different from the one contemplated by the 1945 Amoco-Phillips contract. That contract specified a *price* not explicitly based on various items of cost, but also provided for separate treatment at least of the *increases* of one cost item—taxes. The increase in taxes was to be handled as a separate increment to the price. It was originally contemplated that 75% of the increase in taxes would be charged to Michigan and that Phillips would pass this amount through in its payments to Amoco. Amoco contends that its right to reimbursement was increased to 100% as a result of the change in 1965 in the contract between Phillips and Amoco.

But the basic task of contract interpretation is to determine whether the parties intended that, when a primarily cost-based regulatory ceiling price explicitly including taxes was substituted in a pricing formula for a contract price not based on specific cost items, an additional and separate increment for an increase in Amoco's taxes should continue to be payable to Amoco. Phillips contended that it collected no separate tax reimbursement amount from Michigan and, therefore, had no such amount to pass on to Amoco. The Commission held that Amoco's theory led to a double recovery of taxes and that this could not have been the intent of the parties to the contract. So far as it goes, this is a reasonable interpretation of the contract.

One of Amoco's principal arguments to the contrary rests on the language of the ALJ's Initial Decision of April 1, 1974, which was adopted by the Commission. As noted, the ALJ in his price calculations

stated that Amoco was entitled to charge Phillips certain prices *"exclusive of tax reimbursement"* (emphasis added). Amoco takes this as a finding that Amoco is authorized to charge the approved price *plus* an additional and separate increment for tax reimbursement. On this point, the Commission said in Opinion No. 209:

> The question presently at issue—that of the propriety of a separate increment for tax reimbursement under Article VIII of the contract—was merely alluded to incidentally by the ALJ in the ordering paragraph of his decision; it was never discussed as an issue in that case. This sole reference by the ALJ to the fact that the rates he had determined as proper under Article VII, Section 3 of the contract were "exclusive of tax reimbursement" (52 FPC at 895) could, in these circumstances, only have meant simply that separate tax reimbursement under Article VIII of the contract was not an issue before him to decide at all.

26 FERC ¶ 61,257.

The Commission is correct that a separate tax reimbursement charge was not an issue in the earlier case. No argument or analysis on this point was made by the parties and the order contains no reasoned basis for the interpretation of the ALJ's decision argued for by Amoco. Perhaps, the Commission in Opinion No. 209 was correct in its explanation of the purpose of the "exclusive of tax reimbursement" language. We think the most likely explanation may be that the ALJ believed that an issue of separate tax reimbursement might exist but that the issue was not before him and so he noted it for possible future attention. Since the issue was not raised before the ALJ, we find it difficult to accept the view that he decided in so summary and unsupported a fashion that separate tax reimbursement could be collected. In any event, we would give some weight to the Commission's own interpretation of its earlier orders, *see Amoco Production Co. v. Federal Power Commission*, 491 F.2d 916, 921 (10th Cir.1973), and this interpretation does not comport with Amoco's view.

Perhaps the most troubling issue raised by Amoco in this appeal is that the approach taken by the Commission to the interpretation of the contract arguably results in Amoco's receiving less than 100% of the sums paid by Michigan to Phillips based on Amoco's state severance, production and excise taxes. The Commission apparently takes the position on appeal that, if Phillips' price received from Michigan consists of a regulated and primarily cost-based rate containing taxes rather than a contract rate, Phillips is not required under Article VIII of the Amoco-Phillips contract to pass on any particular percentage of the relevant taxes. Instead the entire pass-through, including the integral tax component, is governed by the formula contained in Article VII. Both Phillips and the Commission argue that, since there is no *separate* tax reimbursement charge from Phillips to Michigan, the percentage pass-through requirements of Article VIII do not apply. The Commission says that "[o]nly if Phillips were to resume collection from Michigan of the contract-based rate (which does not include a tax allowance) and the separate increment for taxes would the 75%–100% issue become ripe for interpretation." Commission Br. at 19. Simply put, if taxes are part of a regulated ceiling price and are not an additional increment to a contract price, the formula of Article VII governs and the mechanism of Article VIII is inoperative.

This analysis, which we believe to be essentially correct, removes the need for deciding whether Phillips, under the contract, must collect from Michigan and pass through to Amoco 100% of relevant tax increases or only 75%. Amoco's argument that 100% pass-through is required is, as noted, based on the amendment in 1965 of the Phillips-Michigan contract to that effect. All parties apparently agree (and it is mathematically indisputable) that Phillips passes through about 80% of the "price received" under Article VII. Therefore, presumably, a 75% requirement in Article VIII would not under any theory be violated if the entire payment from Phillips to Amoco is governed (as is in fact the case)

by the formula in Article VII. We think it is unnecessary, as did the Commission, to determine whether 100% pass-through has been incorporated into Article VIII until the facts present payments from Michigan to Phillips of a contract price *plus* a separate increment for tax reimbursement. We believe this to be the case because, absent these circumstances, the mechanism of Article VIII is not brought into play.

Amoco also makes a plausible argument to the effect that Phillips' alleged retention of unspecified portions of the tax reimbursement monies violates section 110 of the Natural Gas Policy Act, 15 U.S.C. § 3320 (the "NGPA") and section 271.1102 of the Commission's regulations, 18 C.F.R. § 271.1102 (1983). Section 110 permits price ceilings for "first sales" of natural gas to be adjusted upward "to the amount necessary to recover ... (1) State severance taxes attributable to the production of such natural gas and borne by the seller...." 15 U.S.C. § 3320(a)(1). Section 271.1102 of the Commission regulations is to similar effect.

Amoco argues that the only "seller" in these transactions by whom taxes are "borne" is Amoco, and that the statute and regulations forbid Phillips from gaining the benefit of any tax adjustment which it does not pass on in full to Amoco. Amoco therefore argues that the only lawful construction of the contract is that it requires 100% flow-through of the tax reimbursement. Opinion 209 does not directly address this point.

The Commission in its brief is content to point out that the relevant statute and regulations mandate 100% recognition of increased severance taxes, and the rate which Phillips collects from Michigan includes this allowance. It is enough that this resale price (including the full tax allowance) thus becomes a term in the formula to determine the rate Amoco can collect from Phillips. Since no other tax reimbursement monies are being received by Phillips from Michigan, it is clear that no such monies are being retained by Phillips. This argument seems to us, however, not quite to meet Amoco's basic contention that, since Phillips retains about 20% of the funds paid it by Michigan and passes on the rest to Amoco, 20% of the taxes (on a sort of pro rata basis) are arguably retained (or "skimmed off") by Phillips.

We think the most meaningful way to analyze the problem is first to recognize that the taxes are, of course, "borne" by the taxpayer, Amoco. They are, of course, also "borne" by Phillips to the extent it must reimburse Amoco for them. To conclude otherwise would be to make it impossible under the regulations for Phillips to pass *any* taxes along to Michigan. The dispositive point we believe is that it is impossible to conclude that Phillips does *not* pay over the full tax allowance to Amoco. The funds that Phillips received from Michigan contained the tax allowance in commingled or aggregated form. Phillips passed 80% of these commingled funds (or funds based primarily on an aggregation of costs) on to Amoco. How can it be demonstrated that any of the funds retained by Phillips consisted of the tax allowance or that Phillips did not "bear" the full weight of that allowance by passing it on to Amoco? Seemingly, the passing on of a total amount of funds by Phillips to Amoco in excess of the allowance for taxes upon which Phillips' charge to Michigan is based makes it impossible to demonstrate a breach of the statute or regulations. Unless one adopts a principle that the overall margin realized by Phillips is prorated among the cost elements underlying the revenues flowing through (and this principle finds no basis in the contract or elsewhere), there is no reason to believe that tax reimbursement funds as such are being retained by Phillips.

Indeed, it is inherently impossible to treat all tax adjustment as subject to the mechanism of Article VIII. Article VII, in fact, now involves an integral price (including a tax component), received from Michigan and charged at a lower (by about 20%) rate to Amoco. If all components of the price including taxes are subjected to the formula of Article VII, nothing remains as

a segregated item to be subjected to the mechanism of Article VIII or to a 100% flow-through principle. Or, to look at the matter from another perspective, to attempt to impose the appropriate percentage flow-through under Article VIII on some part of the unitary price derived from Article VII would be to violate Article VII in the guise of honoring Article VIII.

We do not believe that our approval of the Commission's decision with respect to the construction of the Amoco-Phillips contract results in injustice. It has been suggested that Amoco might improve its position by somehow relinquishing the component of the base price that represents tax adjustment and instead making its tax recovery separately through Article VIII. In its "Provisional Reply Brief" filed with the Commission in this proceeding (p. 3 n. 4), Amoco disclaimed responsibility for the tax adjustment's inclusion in the formula under Article VII of the contract and suggested that this is a result of an erroneous decision in the 1974 case. In its brief in the present case Amoco again disclaims use of the tax adjustment in the Article VII formula and says that its position has always been that tax adjustment should not be included there. It apparently blames Phillips for furnishing improper numbers for the formula.

Whatever may be the merits of these observations at this late date, the 1974 decision did hold that the regulated ceiling price (which did include tax adjustment) was required by the plain language of the contract to be used in the formula. That decision, which appears to be correct, cannot be reexamined now. The Commission staff and others have asserted that Amoco would recover less if tax adjustment flowed through Article VIII than it does under the Article VII. We have no way of knowing whether this observation is correct, but it is certainly not clear that Amoco is out of pocket because tax adjustment

is a matter for Article VII rather than Article VIII.

Amoco raises as a further issue that the rate allowed it by the Commission's contract construction results in there being a margin for Phillips between the price it charges Michigan and the price Amoco charges it that exceeds regulatory limitations on gas gathering and processing charges. We think this general issue has been settled in prior litigation, *see Amoco Production Co. v. FPC*, 491 F.2d 916 (10th Cir.1973), and Amoco has raised no new question now that need be discussed. And we find the various other points raised by Amoco to be without merit.

AFFIRMED.[4]

---

4. Since we find Amoco's Motion for Leave to Adduce Additional Evidence, filed August 22, 1984, to be without merit, it is hereby DENIED.